**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

LATWANZA P.,

       *Plaintiff,*

v.

COMMISSIONER OF SOCIAL
SECURITY,

       *Defendant.*

_____/

Case No. 1:25-cv-11127

Patricia T. Morris
United States Magistrate Judge

**MEMORANDUM OPINION AND ORDER ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 10, 14)**

### I.   CONCLUSION

Plaintiff Latwanza P.'s motion for summary judgment will be **DENIED** (ECF No. 10), Defendant the Commissioner of Social Security's motion for summary judgment will be **GRANTED** (ECF No. 14), and the final decision of the Administrative Law Judge (ALJ) will be **AFFIRMED**.

### II.   ANALYSIS

#### A.   Introduction and Procedural History

On March 28, 2022, Plaintiff applied for disability insurance benefits and supplemental security income, alleging she became disabled on March 19, 2022. (ECF No. 6-1, PageID.39, 102–03).  The Commissioner initially denied Plaintiff's

1

applications on August 11, 2022, and on reconsideration on February 7, 2023. (*Id.* at PageID.39, 102–03, 113, 140). Plaintiff then requested a hearing before an ALJ, which was held on February 28, 2024. (*Id.* at PageID.58–87). The ALJ issued a written decision on March 29, 2024, finding Plaintiff was not disabled. (*Id.* at PageID.36–57). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied her request on February 18, 2025. (*Id.* at PageID.23–27).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on April 18, 2025. (ECF No. 1). The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters." (ECF No. 8). Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 10, 14) as well as Plaintiff's response to the Commissioner's motion (ECF No. 16).

### B. Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but

less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

3

months."  42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any.  If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.

> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.

> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.

> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.

> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work.  If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled.  If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her RFC, which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since March 19, 2022, the alleged onset date. (ECF No. 6-1, PageID.41).

At step two, the ALJ found the following severe impairments: obesity,

degenerative disc disease of the cervical spine, multiple sclerosis (MS), vision loss, depression, and anxiety. (*Id.*). At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.* at PageID.42).

Next, the ALJ found Plaintiff had the RFC

to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except occasional climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; occasional balancing (as defined by the SCO); occasional stooping, kneeling, crouching and crawling; no exposure to extreme cold/heat, wetness, vibration/vibrating tools, unprotected heights or moving mechanical parts; no operation of a motor vehicle within the scope of employment (due to vision loss); use of a 4-prong cane for ambulation to/from the workstation and for prolonged ambulation; frequent reaching in all directions, handling, fingering and feeling with the left upper extremity. The individual can avoid ordinary hazards in the workplace, such as doors ajar, boxes on the floor or people approaching, but cannot perform work requiring depth perception. Finally, the individual is further limited to "low stress" work, which is defined as: simple, routine tasks in an environment free from fast-paced production (such as an assembly line or conveyor belt) with only simple work-related decision-making and occasional workplace changes; occasional contact with supervisors, coworkers and the general public. (due to stress being a trigger for MS flares in addition to mental health impairments).

(*Id.* at PageID.44–45).

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.49). However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform. (*Id.* at PageID.49–50). Specifically, the ALJ found Plaintiff could perform the requirements of an inspector

6

(24,000 jobs in the national economy), a sorter (19,000), and a packer (18,000). (*Id.* at PageID.50). Thus, the ALJ concluded Plaintiff was not disabled. (*Id.* at PageID.50–51).

### E. Administrative Record

On appeal, Plaintiff argues that the ALJ failed to evaluate the medical opinions of record in accordance with the relevant regulations. While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issue on appeal.

In May 2022, Rosemarie Walch, D.O., and Lindsey Barnhart, DPT, authored a joint medical source statement (MSS), stating that Plaintiff has been diagnosed with MS due to which she experienced symptoms including vision loss and left hemiparesis (weakness on the left side of her body). (ECF No. 6-1, PageID.504). Plaintiff's clinical findings and objective signs included left side weakness and left side sensory changes. (*Id.*). It was noted that Plaintiff had mild improvement with steroids. (*Id.*). While the providers indicated Plaintiff had depression, they did not believe emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. (*Id.* at PageID.505).

The providers opined that Plaintiff was "[i]ncapable of even 'low stress' jobs" and would miss more than four days of work a month due to her condition. (*Id.* at PageID.505, 507). Additionally, they said that Plaintiff would need to have the

option to sit and stand at will, take frequent, short walks throughout the day, and use a standard cane for standing and walking on an "as needed" basis. (*Id.* at PageID.506). The providers also indicated that Plaintiff should only lift and carry objects weighing ten or fewer pounds and that such activities should only be performed occasionally (up to one third of a standard workday). (*Id.*). Similarly, they opined Plaintiff should only occasionally look up, twist, and bend. (*Id.* at PageID.506–07). As for looking down, turning her head, and holding her head in a static position, the providers indicated Plaintiff could frequently (one to two thirds of a standard workday) perform these activities. (*Id.*). And they opined Plaintiff should never crouch/squat, climb ladders, or climb stairs. (*Id.* at PageID.507).

On August 10, 2022, during the initial review of Plaintiff's applications, Sheila Williams-White, PhD, evaluated Plaintiff's allegation of anxiety. (*Id.* at PageID.111). Dr. Willaims-White explained: "The current record indicates that she has just started treatment 2–3wek [sic] before the examination[.] She is taking psychotropic medication. The MSE finds cognitive processes are intact with mild to moderate limitations related to her memory." (*Id.*). She further opined that Plaintiff's activities of daily living were "not significantly impaired by her mental functioning. She does report some memory problems in terms of needing some support in remembering to take medication." (*Id.*).

On February 6, 2023, during the reconsideration stage, William Norton, PhD,

evaluated Plaintiff's allegations of disabling psychiatric symptoms. (*Id.* at PageID.132). Dr. Norton explained:

> An allegation of anxiety was made at the initial level. [The medical evidence of record (MER)] indicated that [Plaintiff] had started receiving M[ental] H[ealth] treatment in the form of psychotropic medication approximately 3 weeks prior to the assessment. [A mental status exam] found that [Plaintiff's] cognitive processes were intact with mild to moderate limitations related to her memory. An MSS indicated that [Plaintiff] was expected to have no limitations in any of the work related functional domains. [Plaintiff's Psychiatric Review Technique Form] indicated moderate limitations for [her] ability to understand and remember information. [Plaintiff] had reported in a 3373/ADL [(activities of daily living)] form that her ADLs were not significantly impaired by her mental functioning. She did report some memory problems related to her requiring some support in remembering to take medication. The diagnosis [sic] had been diagnosed with [major depressive disorder (MDD)], recurrent and [u]nspecified [a]nxiety [d]isorder.
>
> Allegations of a mood disorder and anxiety have been made for the reconsideration. [Plaintiff] has submitted an updated 3373/ADL form where she reports she is unable to work due to her physical problems. She continues to report needing reminders to take her medications. She sometimes will lie [i]n bed sleeping in the morning after having a bad night. She is able to go out alone, use public transportation, shop, and manage money (does not use a checkbook). She does not drive due to vision issues. Socially, she interacts with others 10X per month and attends church. She reports problems with memory, task completion, concentration, understanding, and following instructions. She has an attention span of 15 to 20 minutes before her eyes get blurry. She is OK with following directions most of the time. She does not manage stress or change well. She sometimes cries for no reason.
>
> Updated MER includes a tele psychiatric evaluation dated 9/14/22 . . . showing [Plaintiff] to have been diagnosed with MDD, recurrent, moderate and [generalized anxiety disorder (GAD)]. An MSE noted [Plaintiff's] mood to be mildly anxious and moderately depressed with slight [i]rritability being noted. She was otherwise appropriate and

somewhat pleasant. Affect was appropriate to mood. Her appearance and behavior were appropriate. [Plaintiff] was oriented to all three spheres. Speech was normal and fluid. Thought process was logical and [fund of knowledge] was average. Attention and [c]oncentration were [i]ntact. Judgement and insight were good. Both [s]hort [t]erm and [l]ong [t]erm [memory] were intact.

A review of the file indicates that [Plaintiff] has alleged a mood disorder in addition to anxiety for the reconsideration. Updated MER shows the clmt to have been diagnosed with MDD, recurrent, moderate and GAD (9/14/22). While appearing moderately depressed and mildly anxious, her cognitive functions for an MSE w[ere] reported to [within normal limits]. [Plaintiff] has reported in an updated 3373/ADL form that she is unable to work due to her physical issues. Her attention is limited by vision problems. She is able to go out alone, use public transportation, shop, follow instructions, and manage her money. She does not manage stress or change well. Overall updated evidence does not indicate there to have been a worsening of [Plaintiff's] symptoms or level of impairment since the initial assessment. That assessment was substantively and technically correct and the prior rationale correctly presented and resolved all pertinent issues. Subsequently, the initial assessment is affirmed.

(*Id.*).

In February 2024, Sarah Johnson, FNP-BC, of the Michigan Institute for Neurological Disorders, provided an MSS, explaining that she had treated Plaintiff every three months since April 2022 for her MS, which had been diagnosed via MRI. (ECF No. 6-2, PageID.1254). Plaintiff's symptoms included fatigue, balance problems, poor coordination, weakness, unstable walking, numbness/tingling, sensory disturbance, increased muscle tension, bladder problems, sensitivity to heat, pain, depression, difficulties with remembering and solving problems, and blurred vision. (*Id.*). NP Johnson indicated that Plaintiff had "bilateral lower extremity

weakness, ambulate[d] with a cane: needs a 4 prong cane and on occasion a walker."
(*Id.*).  She also noted that Plaintiff's symptoms may worsen with exertion, including walking longer distances.  (*Id.*).  Plaintiff was doing well on a medication used to manage MS, but it was noted "[s]he does still have ongoing [and] fluctuating symptoms."  (*Id.*).

NP Johnson opined that Plaintiff was "[i]ncapable of even 'low stress' jobs," and noted that an increase in stress can contribute to an increase in MS symptoms. (*Id.* at PageID.1255).  She estimated that Plaintiff would miss more than four days of work per month and be off task for 25% or more of a standard workday.  (*Id.* at PageID.1255, 1257).  More specifically, she believed that Plaintiff would need to take 15 to 20-minute breaks at least once every two hours.  (*Id.* at PageID.1256). Plaintiff could walk less than one block before needing rest, could only sit for 30 minutes at a time, and could only stand for five minutes at times.  (*Id.* at PageID.1255).  As such, NP Johnson concluded that Plaintiff would require a job where she could shift between sitting, standing, and walking at will.  (*Id.*).  Plaintiff could lift less than 10 pounds occasionally and 10 pounds rarely; could occasionally twist and stoop; could rarely crouch and climb stairs; and could never climb ladders. (*Id.* at PageID.1256).  NP Johnson also indicated that Plaintiff was limited in her ability to do repetitive motions (*i.e.*, reaching, fingering, and handling) and tolerate various environmental conditions (*e.g.*, extreme temperatures and noise).  (*Id.*).

11

Other evidence is discussed as relevant below.

**F.      Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B).  The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources.  An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only.  For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021).  A medical source is

an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d).  In contrast, a nonmedical source is "a source of evidence who is not a medical source."  *Id.* § 404.1502(e).  "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy."  *Id.*

The Social Security Administration (SSA) "will not defer or give any specific

13

evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

14

(i)    Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)   Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)  Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v)    Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider

[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

15

Finally, the SSA will consider "other factors." These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1).   The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).   As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision.   [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).   The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of

17

paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c).  The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

    (i)    Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

    (ii)    Statements about whether or not [the claimant has] a severe impairment(s);

    (iii)    Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

    (iv)    Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

    (v)    Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

18

(vi)    Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii)   Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii)  Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed,

apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g).  Further,

"[s]igns must be shown by medically acceptable clinical diagnostic techniques.

Psychiatric signs are medically demonstrable phenomena that indicate specific

psychological abnormalities, e.g., abnormalities of behavior, mood, thought,

memory, orientation, development or perception, and must also be shown by

observable facts that can be medically described and evaluated." *Id.*  Laboratory

findings "means one or more anatomical, physiological, or psychological

phenomena that can be shown by the use of medically acceptable laboratory

diagnostic techniques," which "include chemical tests (such as blood tests),

electrophysiological studies (such as electrocardiograms and

electroencephalograms), medical imaging (such as X-rays), and psychological

tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in

which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a).  But the SSA clarified that

statements about [the claimant's] pain or other symptoms will not alone

20

establish that [the claimant is] disabled.  There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.*  Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.*  The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or

21

aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)    Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get

benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a).  Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)    The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)    The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)    The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

###    G.    Argument and Analysis

As stated above, Plaintiff raises one issue on appeal.  Whether the ALJ failed to evaluate the medical opinions of record in accordance with the relevant

regulations.

As a refresher, when evaluating medical opinions, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ must explain her approach with respect to supportability and consistency. *Id.* § 404.1520c(b). Supportability means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

Further, the ALJ is required to provide a "sufficiently detailed articulation of application of those factors in which the ALJ must show their work, *i.e.*, to explain in detail how the factors actually were applied to each medical source." *Huizar v. Comm'r of Soc. Sec.*, 610 F. Supp. 1010, 1020 (E.D. Mich. 2022) (citation modified). "[T]he measuring stick for an 'adequate discussion' [of these factors] is whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful

24

review of h[er] finding as to whether the particular medical opinion was supported by substantial evidence." *Terhune v. Kijakazi*, No. 3:21-37, 2022 WL 2910002, at *3 (E.D. Ky. July 22, 2022) (citations omitted).

Plaintiff argues that the ALJ erred when evaluating several medical opinions, specifically those from the agency reviewers as to Plaintiff's mental functioning, Dr. Walch and Barnhart's, and NP Johnson's.[1] The ALJ's discussion of these opinions follows:

> The assessments of the state agency consultants are generally persuasive. The mental assessment noted moderate limitations as to understanding and remembering information, but otherwise mild limitations. The consultants concluded the claimant retains the mental capacity to sustain an independent routine of detailed work related activity and can adapt to changes in routines. She is able to tolerate [and] manage social demands. She may have some difficulty with remembering but responds to reminders. (Exhibit 1A; 4A; 6A; 7A). This assessment is generally persuasive and is well supported by the claimant's conservative level of mental health treatment, her largely normal exams, and her reports of sustained improvement with medication.
>
> &ast; &ast; &ast;
>
> The medical source statements from Rosemarie Walch DO and Sarah Johnson, FNPBC are not generally persuasive. The limitations stated herein are not entirely consistent with the objective evidence nor are these assessments fully consistent with each other. The assessments appear to rely heavily on subjective report[s] of symptoms and limitations provide[d] by the individual and the assessed limitations are not supported by medical findings. The claimant's stable condition and ability to travel do not support the level of limitation assessed, such as a need to be absent on a recurrent basis more than four days per month

---

[1] These opinions are summarized above in subsection E.

25

or a need to be off-task more than 25% of the workday.  (Exhibit 2F; 26F).

(ECF No. 6-1, PageID.48).[2]

After reviewing the opinions at issue and the ALJ's evaluation of the same, "[t]he Court finds that the ALJ sufficiently articulated the supportability and consistency" of each opinion.  *Mark D. v. Comm'r of Soc. Sec.*, No. 6:24-CV-166, 2025 WL 1656639, at *7 (E.D. Ky. June 11, 2025).  The ALJ "properly considered the factors as set forth in the regulations to determine the persuasiveness" of each opinion, including "articulating the supportability and consistency of each medical opinion."  *Id.* (citation modified).  While an ALJ is not required to use the words supportability and consistency in her analysis, *see id.* (collecting cases), the ALJ here *did* use these terms when explaining how persuasive she found each opinion.  Contrary to Plaintiff's argument on appeal, the ALJ's use of these terms was not done in a boilerplate fashion.

The ALJ explained that the agency physicians' opinions were persuasive because they were "well supported by the claimant's conservative level of mental health treatment, her largely normal exams, and her reports of sustained

---

[2] Plaintiff correctly notes that the ALJ should have attributed Dr. Walch's opinion to both Dr. Walch and Barnhard as they coauthored the opinion.  However, the Court agrees with the Commissioner that "it is unclear why she believes it undermines the ALJ's analysis of the opinion.  At most, this was a scrivener's error and has no bearing on the validity of the ALJ's evaluation of the medical opinion."  (ECF No. 14, PageID.1304 n.1).

improvement with medication." (ECF No. 6-1, PageID.48).  While the ALJ perhaps should have said the opinions were very consistent with the other evidence rather than "well supported," her explanation nonetheless demonstrates that she considered the relevant factors (correctly focusing her efforts on supportability and consistency) and enables the Court to follow her reasoning.  *See Thomas v. Comm'r of Soc. Sec.*, No. 3:25-CV-00441, 2025 WL 2774862, at *11 (N.D. Ohio Sept. 30, 2025) ("Even with the ALJ's transposition of the regulatory terms, the ALJ considered the evidence within Dr. Kadivar's examination and opinion and contrasted it against the rest of the available medical record to ultimately determine it unpersuasive."), *report and recommendation adopted*, 2026 WL 882833 (N.D. Ohio Mar. 31, 2026).

Similarly, the ALJ stated that the opinions from Plaintiff's treating providers, were not "generally persuasive" because the opinions were "not entirely consistent with the objective evidence nor . . . fully consistent with each other." (*Id.*).  The ALJ thus explicitly considered the consistency of both opinions and found it lacking when directly comparing the two opinions and when comparing each opinion to the rest of the evidence.  This is an adequate discussion of consistency because the Court is able to understand why the ALJ was unpersuaded by these opinions and see that she considered the consistency of the opinions when reaching that conclusion.  *See Terhune*, 2022 WL 2910002, at *3.

Likewise, the ALJ adequately considered the supportability of these opinions.

27

She explained that "[t]he assessments appear to rely heavily on subjective report[s] of symptoms and limitations provide[d] by the individual and the assessed limitations are not supported by medical findings." (*Id.*).  In a similar case, the court reasoned that such analysis went to the supportability of a medical opinion, noting "that the supportability analysis focuses on the physicians' explanations of the opinions." *Mulka v. Comm'r of Soc. Sec.*, No. 22-11252, 2023 WL 5232877, at *3 (E.D. Mich. Aug. 15, 2023) (citation modified).  The court explained that by time the ALJ reached the opinion at issue, she had already described why she found the plaintiff's statements regarding her symptoms not to be entirely consistent with the other evidence.  *Id.*  Further, when evaluating the opinion, the ALJ rejected the opining doctor's statements regarding absenteeism because the doctor did not explain why the plaintiff could be expected to miss work so often.  *Id.*  As such, the court concluded that the ALJ considered the doctor's "explanations of her opinions and found them wanting, which goes to supportability." *Id.*  The same is true here where the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.* at PageID.46).

While Plaintiff "may believe that the ALJ should have specifically discussed

28

all of the medical evidence when evaluating the supportability and consistency" of each opinion, this is not required. *Mark D.*, 2025 WL 1656639, at *8. The ALJ's discussion "does not need to be lengthy" and "there is no requirement that an ALJ discuss each limitation from an opinion that she adopts, or fails to adopt, when she has rejected or adopted the opinion on broader grounds." *Id.* (citation modified).

Moreover, to the extent Plaintiff argues that the ALJ erred by not including the exact same limitations in the RFC as those suggested by the agency physicians' solely because the ALJ found these opinions "generally persuasive," this is not error. Even where an ALJ finds an opinion persuasive, there is no requirement to adopt all limitations, *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015), nor is there a "requirement to cite to every piece of evidence or conclusion," *Robinson v. Comm'r of Soc. Sec.*, No. 22-1397, 2022 WL 17168444, at *2 (6th Cir. Nov. 22, 2022). And as the Commissioner points out, "the ALJ's RFC finding restricted Plaintiff's activities far beyond" anything recommended by either agency physician, "limiting her to 'simple, routine tasks' with no fast-paced production and 'only simple work-related decision-making and occasional workplace changes.' " (ECF No. 14, PageID.1299 (quoting ECF No. 6-1, PageID.45)). *See Mosed v. Comm'r of Soc. Sec.*, No. 2:14-cv-14357, 2016 WL 6211288, at *7 (E.D. Mich. Jan. 22, 2016) ("Plaintiff's argument that the ALJ erred in assessing a *more restrictive* RFC than that opined by the State agency consultants is curious and unavailing."

(emphasis in original)), *report and recommendation adopted*, 2016 WL 1084679 (E.D. Mich. Mar. 21, 2016).

Ultimately, the Court concludes that the ALJ's conclusions as to the persuasiveness of each opinion are supported by substantial evidence. And because the ALJ adequately complied with the relevant regulations and supported her assessments of the opinions with substantial evidence, "this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (citation modified). Accordingly, Plaintiff's motion for summary judgment is denied.

## III.   ORDER

For these reasons, Plaintiff's motion for summary judgment is **DENIED** (ECF No. 10), Defendant's motion for summary judgment is **GRANTED** (ECF No. 14), and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: April 15, 2026                    S/PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge

30